### PUTNEY v. UNITED STATES.
No. 9011.

District Court, D. Colorado.
Aug. 5, 1933.

Kenaz Huffman and Sherman A. Sutliff, both of Denver, Colo., for plaintiff.

John G. Reid, Asst. U. S. Atty., of Hugo, Colo., and R. A. Toomey, Atty. Veterans' Administration, of Denver, Colo., for the United States.

SYMES, District Judge.

This suit is on a war risk insurance policy tried to the court without a jury. At the conclusion of all the evidence each side moved for judgment. The sole question is: Was plaintiff totally and permanently disabled on June 19, 1919?

Putney entered the army of the United States March 18, 1918, and served abroad in the artillery branch of the 89th Division. He was in several major offensives, and his war record shows no hospitalization until after the Armistice. In February, 1919, while in Germany with the Army of Occupation, he was hospitalized. At that time he says he felt dopey, had pains in his back, body became swollen, and he had the desire to urinate very frequently. These objective symptoms, he says, have continued intermittently ever since, and have progressively grown worse. His doctors diagnosed it as chronic interstitial nephritis, and say he has been totally and permanently disabled since the first onset in the spring of 1919. Nephritis is incurable, according to the testimony of Dr. Maier, who examined plaintiff for the first time a few days before the trial in order to testify as an expert.

Dr. Gleason of Fort Collins examined the subject several times for the Veterans' Bureau, between August, 1919, and March, 1921, at Fort Collins, where plaintiff then resided while taking vocational training. He stated on the stand that at that time he gave a diagnosis of chronic nephritis, incurable; symptoms, nervousness, albumen and limitation of the kidney functions, due to destruction of tissue; that plaintiff was totally and permanently disabled on and ever since the critical date. On his cross-examination it was brought out that these examinations were to determine plaintiff's eligibility for vocational training. In six written reports to the Veterans' Bureau at the time, he stated vocational training was practical.

Dr. Gleason also examined Putney in September, 1920, to determine whether he was eligible to have his lapsed insurance policy reinstated. He reported that plaintiff's physical condition was normal; no deformity or departure from normal in any respect; that he had no disease, injury, or habits that would impair the risk, which he considered a first-class one for insurance purposes. This recommendation was made 15 months after the date when the doctor now says plaintiff became totally and permanently disabled. As a result of Dr. Gleason's recommendations, apparently, the plaintiff was given vocational training for two years or more, and paid $157 per month.

Dr. Maier, called by plaintiff, saw him first in July, 1933. He says he was total and permanent in June, 1919.

The A. G. O. record discloses a finding of chronic interstitial nephritis at Spicer, Germany, prior to discharge, loss of kidney function of 50 per cent., and a 75 per cent. disability incurred in line of duty.

Dr. Andrews of Walsenburg, a government witness, examined the plaintiff in January, 1922, in behalf of the Veterans' Bureau for compensation rating. At that time the plaintiff was a state ranger on strike duty at Walsenburg. He says he made no complaint of any physical ailment, had a good physique, organs negative, and that the work he was then doing, with which the doctor was familiar, did not hurt him; that he was not total and permanent at that time. He found no symptoms of nephritis.

The records of the examination at Fort Douglas, Utah, before discharge, show the genito-urinary system negative, etc.

The employment record of the plaintiff since the critical date, June, 1919, may be summarized as follows: Vocational training course, animal husbandry, State Agricultural College, Fort Collins, for two years without deduction of pay for loss of time. Next, after a physical examination, he served 11 months with the Colorado state rangers on strike duty in Southern Colorado from January, 1922, to late fall, at $115 per month for the first three months, then raised to $125. Next with the Denver & Rio Grande Railroad as a night watchman at $100 a month. From 1923 until the fall of 1925, the plaintiff was in California, Oregon, and Canada, working in a steel mill at Los Angeles; boilermaker's helper; wire rope factory; handling hides; running a threshing machine; trucking paving material; elevator pilot; janitor and hotel night clerk, etc. These jobs were terminated, according to the plaintiff, by discharges, or lack of further need for his services. He then went to Chicago and worked for the Pinkerton Detective Agency as night watchman for nine months continuously, patrolling in the downtown part of the city, and in the fall of 1927 returned to Colorado and

rejoined the state police for strike duty at Walsenburg. Later he worked as a mine guard and deputy sheriff from $100 up to $150 per month. Following this he worked for the Merchants' Police Bureau in Denver as night watchman at $100 a month for 10 months. In May, 1930, he became a guard at the Colorado State Penitentiary. He held this job for 26 months at $100 a month. The Warden and other officers of the Penitentiary testify that he performed his work satisfactorily, not being absent or ill for more than the permitted time allowed all employees. Furthermore, the officers under whom he served as a state ranger (ex-army officers) testified his work was satisfactory, and that his physical condition did not interfere with a proper performance of his duties.

■ Turning for the moment from the war of the medics to this industrial record, we find a practically continuous employment record from the time of separation from the army to 1932. His earnings never fell below $100 a month, and for most of the time exceeded that sum. While not munificent, perhaps, it exceeds the minimum wage now fixed by the executive order of the President. This work required a constant expenditure of physical energy, a clear head, and long hours. To the layman, at least, policemen, state rangers, etc., are men of exceptional physique.

Furthermore, his absences from duty were such only as are incident to men of normal health. We recognize that the plaintiff need not necessarily have been bedfast or bedridden, and that soldiers should not be penalized because they "carried on," seemingly as a well person to the detriment of their health, and that all legitimate doubts must be resolved in their favor; yet in the instant case, disregarding for the moment the medical testimony, the physical facts force the conclusion that the plaintiff was not permanently and totally disabled on the critical date. No doubt he has had for some time a permanent disability, but he must prove more. A court or jury may not speculate as to the permanence, totality, or date thereof, but must be convinced by a slight preponderance at least, of satisfactory evidence. Falbo v. U. S. (C. C. A.) 64 F.(2d) 948.

■ We may, perhaps, disregard plaintiff's statements and conduct. We are required, however, to notice the contradictions in the testimony of the medical expert. Bearing in mind the infirmities of memory, we feel justified in giving more weight to the findings and opinion of a physician at the time the subject was under constant observation than to what he says now, 10 years later.

Dr. Maier, a well-qualified expert, called by plaintiff, never saw plaintiff until July, 1933. He bases his opinion that plaintiff was totally and permanently disabled 14 years ago upon the man's own story, the evidence he heard while sitting in the courtroom, and an examination made a few days before trial. Such evidence, while competent and of some probative value, must be weighed in the light of all these factors.

These cases are largely questions of fact, and no universal test can be formulated as to the type or extent of the impairment of mind or body which renders it impossible for the disabled person to follow continuously a substantially gainful occupation, nor as to what the conditions are, which render it reasonably certain that it will continue throughout the life of the insured. What our Court of Appeals has said on these questions is summed up in the Nicolay Case, 51 F.(2d) 170, 173. See, also, Judge Kenyon's opinion in the Blair Case (C. C. A.) 47 F.(2d) page 109, at page 111, on inconsistent claims. Judge Phillips has brought the authorities down to date in the Fitzpatrick Case (C. C. A.) 62 F.(2d) 562, relied upon by plaintiff.

I see no analogy in the facts. Fitzpatrick was gassed and broke down with influenza. On return to active service was wounded in his left knee and right foot. After discharge was unable to hold any steady employment, and on one occasion was discharged due to his inability to work continuously. He had a definite record of illness ever since he left the army, and, as far as disclosed, there was no contradiction in the testimony of Dr. Childers, who examined him from 1921 to 1926. The lower court and the Circuit Court undoubtedly applied the rule that work is not continuous or substantially gainful where it is spasmodic with frequent interruptions or change of employment, due to impaired physical or mental condition. These elements are wholly lacking in the case at bar.

The motion of defendant is granted, judgment ordered for defendant with costs, and all proper exceptions saved.